UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES R. METCALFE II, | |
| Plaintiff, | Civil Case No. 23-73 |
| -vs- | |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| DENIS R. MCDONOUGH, Secretary, Department of Veterans Affairs, | |
| LISA POZZEBON, Assistant Deputy Undersecretary for Field Operations, National Cemetery Administration, Department of Veterans Affairs, | |
| WILLIE CLYDE MARSH, Executive Director, North Atlantic District, National Cemetery Administration, Department of Veterans Affairs, | |
| RANDY C. REEVES, Former Undersecretary for Memorial Affairs, Department of Veterans Affairs, and | |
| MELISSA S. DECKER, Special Assistant to the Undersecretary for Memorial Affairs, Department of Veterans Affairs, | |
| Defendants. | |

1.     This is an action for injunctive relief, declaratory judgment, equitable relief, and damages filed by Plaintiff, James R. Metcalfe II ("Plaintiff" or "Metcalfe"), by and through his attorney, Nathan McMurray of Advocates for Justice, Chartered Attorneys, pursuant to Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 791 *et seq.*

2.      As is set forth in detail below, the U.S. Department of Veterans Affairs ("VA" or the "VA"), by and through the parties named, discriminated against Plaintiff on the basis of Race (Native American), Disability (Leukopenia and paralyzed right foot and ankle), and Reprisal (prior EEO activity).

## JURISDICTION AND VENUE

3.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

4.      Venue is properly laid in the Western District of New York under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events giving rise to the instant complaint occurred in the Western District of New York.

## PROCEDURAL REQUIREMENTS

5.      Plaintiff has exhausted administrative remedies.

6.      Plaintiff filed a formal complaint of discrimination with VA's Office of Resolution Management, Diversity, and Inclusion on or about March 19, 2021.

7.      VA had until December 12, 2022, to issue Plaintiff a Final Agency Decision pursuant to Chapter 10 of EEO Management Directive 110. However, VA failed to issue Plaintiff a Final Agency Decision, meaning Plaintiff's 90-day deadline to file a civil action in an appropriate U.S. District Court began December 12, 2022.

8.      Accordingly, Plaintiff has timely filed the instant complaint herein.

## PARTIES

9.      Plaintiff lives in Cattaraugus County, in the State of New York, and is a Native American (Race) with both Leukopenia—a circulatory disorder characterized by an abnormally low number of white blood cells in the blood circulation—and a paralyzed right foot and ankle from a military-career-ending leg injury (Disabilities). In 2014, Plaintiff and the VA settled three

prior Equal Employment Opportunity complaints of Plaintiff (which form the basis of Reprisal). At all times relevant to the instant Complaint, Plaintiff was a GS-1630 Cemetery Administrator employee of VA assigned to Western New York National Cemetery ("WNYNC"), initially as an ancillary duty and later as his primary duty assignment. WNYNC, at 1254 Indian Falls Road in Pembroke, New York, is a facility under the custody, control, and operation of VA, and was historically a site occupied by members of the modern-day Tonawanda Seneca Nation of Indians.

10.     Defendant U.S. Department of Veterans Affairs ("VA") and its administrative units the VA National Cemetery Administration ("NCA") and North Atlantic District ("NAD"), with offices located at 810 Vermont Avenue, NW, Washington DC 20420.

11.     Defendant Denis R. McDonough ("MCDONOUGH"), Secretary of the VA, with offices located at 810 Vermont Avenue, NW, Washington DC, 20420.

12.     Defendant Lisa J. Pozzebon ("POZZEBON"), NCA Assistant Deputy Undersecretary for Field Operations, with offices located at 810 Vermont Avenue, NW, Washington DC 20420.

13.     Defendant Willie Clyde Marsh ("MARSH"), with offices located at 5000 Wissahickon Avenue, Philadelphia, Pennsylvania 19144.

14.     Defendant Randy C. Reeves ("REEVES"), former VA Undersecretary for Memorial Affairs, who resides at 107 Camden Walk, Madison, Mississippi 39110.

15.     Melissa S. Decker ("DECKER"), Special Assistant to the VA Undersecretary for Memorial Affairs, with offices located at 810 Vermont Avenue, NW, Washington DC 20420.

**STATEMENT OF FACTS**

**A.    BACKGROUND: JAMES METCALFE HAS AN EXCEPTIONAL EMPLOY-MENT RECORD WITH THE U.S. DEPARTMENT OF VETERANS AFFAIRS**

16.    Plaintiff is a Native American, service-disabled Veteran—for service in combat zones in Bosnia—husband of 39 years, father of two, and grandfather of seven.

17.    After a four-year recovery from a military-career-ending injury suffered in Bosnia, Plaintiff began working for VA on December 4, 2000, as a Cemetery Equipment Operator at Indiantown Gap National Cemetery in Annville, Pennsylvania, where he was responsible for digging the graves of fellow Veterans.

18.    After just 18 months of employment with VA, Plaintiff's exceptional leadership skills propelled him to the rank of Director of Bath National Cemetery.

19.    Over the next two decades, Plaintiff held the Director position at 15 different National Cemeteries from coast to coast, often supporting multiple facilities simultaneously for extended periods while VA filled vacancies.

20.    In many respects, he was VA's "fixer"—a coveted and highly regarded expert that VA routinely called upon to correct deficiencies at failing and mismanaged National Cemeteries, and a mentor to new Directors and those not making the grade.

21.    Plaintiff earned a superlative employment record, consistently achieving "Outstanding" annual performance ratings—the highest achievement possible on VA's 5-point performance rating scale.

22.    Throughout his first 19 years of employment at VA, Plaintiff had never been suspected or accused of wrongdoing or misconduct of any kind; instead, it was Plaintiff who conducted internal investigations of VA's wrongdoers and made corrective recommendations.

**B.    MARSH AND REEVES *REPEATEDLY* HONORED METCALFE FOR SIX MONTHS IMMEDIATELY BEFORE MARSH AND REEVES DISCOVERED METCALFE'S NATIVE AMERICAN LINEAGE**

23.    On or about April 26, 2019, MARSH and REEVES traveled to Plaintiff's duty station of Indiantown Gap National Cemetery in Annville, Pennsylvania, to honor Plaintiff with an award "in recognition of superior performance."

24.    On or about May 22, 2019, MARSH honored Plaintiff with an appointment as Acting Cemetery Director of Calverton National Cemetery—a challenging Senior Executive Service position well above Plaintiff's pay grade at the largest, and one of the most active national cemeteries currently overseen by the NCA—in addition to the Plaintiff's primary duties as Director of Indiantown Gap National Cemetery.

25.    On or about June 11, 2019, MARSH honored Plaintiff with an appointment as Acting Deputy Director of Calverton National Cemetery—a GS-15 position one grade above Plaintiff's pay grade—in addition to the Plaintiff's primary duties as Director of Indiantown Gap National Cemetery.

26.    On or about June 21, 2019, MARSH honored Plaintiff by extending Plaintiff's appointment as Acting Deputy Director of Calverton National Cemetery in addition to the Plaintiff's primary duties as Director of Indiantown Gap National Cemetery.

27.    In or about August 2019, MARSH and REEVES visited Indiantown Gap National Cemetery to again honor Plaintiff with a Certificate of Appreciation "in recognition of [Plaintiff's] dedication and commitment to providing excellent customer service to our Nation's Veterans and their families."

## C.   NATIVE PEOPLES REPEATEDLY BERATED DURING WNYNC PLANNING, DESIGN, AND CONSTRUCTION PROCESSES

28.    As early 2015, Plaintiff was directly involved in the design process for the WNYNC. As early as 2019, however, Plaintiff became aware of prejudices held by local and federal officials towards native American peoples.

29.    The property upon which the WNYNC is built was once occupied by the Tonawanda Seneca Nation of Indians. Accordingly, VA found over 5,000 Native American artifacts on the WNYNC site.

30.    During meetings and general discussions, the WNYNC site and historic linkage to local Native American peoples was seen as a burden—as it had been a perceived burden on other federal projects—that needed to be managed, rather than a cultural asset for the project and the community.

31.    More distressingly, negative comments regarding the impact of the numerous archeological findings were common among local and federal officials.

32.    On one occasion, a $65,000 excavator was stolen from the WNYNC jobsite, and immediately the local Tonawanda Nation was assumed responsible.

33.    Further, all instances of minor theft and vandalism were assumed the work of residents of the nearby Tonawanda Reservation, which caused Plaintiff great frustration as he routinely had to combat these assumptions to identify what had actually occurred.

34.    In one instance, a small house on the WNYNC site was vandalized and used for drinking, and immediately residents of the Tonawanda Reservation were wrongfully accused (without merit or evidence of any sort).

35.    Upon information and belief, the only individuals ever found to have vandalized the WNYNC site were non-Native American youths who lived nearby.

36.     This atmosphere of presumed guilt, aggression, and bias towards the Tonawanda Nation and Native Americas generally caused Plaintiff great stress and anxiety as he worked to dispel false and harmful allegations.

## D.     MARSH LEARNS METCALFE IS NATIVE AMERICAN AND IMMEDIATELY BEGINS TO HARASS AND UNDERMINE METCALFE

37.     As shown above, on five separate occasions, MARSH repeatedly and consistently honored, celebrated, and rewarded Plaintiff for exceptional professionalism and leadership from April 2019 to August 2019.

38.     However, after learning of Plaintiff's race and identity as a Native American, in September 2019, MARSH immediately ceased all such positive recognition of Plaintiff, and instead carried out a still-ongoing pattern of harassment and discrimination against Plaintiff.

39.     This began on or about September 24, 2019, during a WNYNC construction project team meeting. With MARSH and other witnesses in attendance, Plaintiff announced that he is Native American (he is specifically a member of the Seneca Nation of Indians and Iroquois Confederacy). He shared some details of his upbringings and how his family celebrated Native American customs and traditions.

40.     Plaintiff volunteered these personal facts when he offered to represent VA in meetings with the Tonawanda Seneca Nation of Indians, which, as stated, once occupied the land on which WNYNC is located. Plaintiff hoped he could ease tensions between the VA and the Tonawanda Nation.

41.     Environmental regulatory restrictions prevented VA's contractor from performing excavation work at WNYNC without the presence of a representative from the Tonawanda Seneca Nation to observe the work, but through late September 2019, VA had been unable to obtain the cooperation of the Tonawanda Seneca Nation to provide such an observer.

42.     With the support of the WNYNC project team, Plaintiff met with Chief ROGER HILL of the Tonawanda Seneca Nation on or about September 29, 2019, and successfully resolved the communication impasse on behalf of VA, which enabled excavation work at WNYNC to commence.

43.     Fewer than two weeks after Plaintiff's September 24, 2019, declaration of his racial identity and lineage, MARSH—later joined by REEVES, DECKER, and POZZEBON—began perpetrating a now-years-long campaign of discrimination and harassment that has annihilated Plaintiff's reputation, career, and psyche.

44.     Direct evidence acquired by Plaintiff demonstrates MARSH's race-based discriminatory motives against Plaintiff. The universe of discrimination and harassment thus far perpetrated against Plaintiff, however, collectively by MARSH, REEVES, DECKER, and POZZEBON extends to egregious acts of disability discrimination and retaliatory treatment.

## E.     MARSH STRIPS METCALFE OF AUTHORITY—TAKING OVER A PUBLIC MEETING AND PROVIDING FALSE INFORMATION TO MISLEAD THE PUBLIC

45.     Plaintiff began to have disagreements with MARSH and others regarding funding to properly complete the WNYNC project. In particular, Plaintiff felt that additional funding was needed to make the intersection and entrance to the VA safe, and the Plaintiff was worried that the timeline to complete the project could not be properly executed given budget constraints.

46.     Further Plaintiff was worried that the project was being rushed to get a political win for the outgoing Presidential Administration of Donald J. Trump and in particular REEVES and the VA, before the possible national change in leadership.

47. To collect information to make his case and to show that the public at large shared his concerns, Plaintiff began some limited public outreach, as was his duty within the scope of his position (see below).

48. Specifically, on or about October 9, 2019, Plaintiff had planned to lead a public meeting to discuss burial benefits and services that WNYNC would offer the Western New York community, as he was authorized and required to do in accordance with the June 28, 2010 version of NCA Handbook 8500, Section 3(e), which was in effect at the time.

49. The NCA Cemetery Opening Plan contains four pages devoted to a Cemetery Director's "outreach" responsibilities and includes an exhaustive list of public outreach activities, such as, **meeting with the public**. "Know who they are so they will know who you are," the NCA Cemetery Opening Plan says.

50. Just days before the event, MARSH told Plaintiff that hosting a public meeting was above his pay grade and that VA Senior Leadership will be presenting at the meeting to control messaging.

51. Note that six months earlier MARSH assigned Plaintiff to be the acting Executive Director of VA's largest and busiest national cemetery—a position no fewer than two pay grades above Plaintiff's. That was before MARSH knew Plaintiff was Native American.

52. On or about October 9, 2019, MARSH inserted himself into the public meeting hosted by Plaintiff. In that meeting, he spoke over Plaintiff, even though MARSH was not on the agenda.

53. In his remarks before the public, media, elected officials, and Congressional staff in attendance, MARSH falsely claimed that VA had sufficient funding in place to build expanded portions of WNYNC even though MARSH knew VA had no funding for such expansions.

54.     MARSH insisted that the WNYNC plan was on track and would be safely completed. In private conversations with Plaintiff, MARSH said the exact opposite.

55.     MARSH's false statements were in response to questions raised by meeting attendees and initiated the VA's years-long hardline position against providing sufficient funding to WNYNC for construction and operations.

56.     Plaintiff was astounded by MARSH's comments and behavior at the meeting, but he understood that he was outranked by MARSH and had little recourse. Thus, he continued to make his concerns known to MARSH and others regarding construction shortcuts and limited funding for the WNYNC behind closed VA doors.

**F.     SENATOR SCHUMER SENDS LETTER ECHOING THE CONCERNS OF THE PUBLIC REGARDING WNYNC FUNDING, WHICH LEADS MARSH TO BLAME METCALFE FOR "LEAKS"**

57.     On or about November 19, 2019, U.S. Senator CHARLES E. SCHUMER ("SCHUMER") sent a letter to VA concerning WNYNC funding, echoing concerns raised by the public in the October 9, 2019 meeting.

58.     On or about November 22, 2019, REEVES met with SCHUMER to discuss WNYNC funding in response to SCHUMER's November 19, 2019, letter, and directly afterwards, REEVES ordered his subordinates to provide no additional funds to WNYNC, effectively starving the construction project.

59.     On or about December 4, 2019, REEVES visited WNYNC, told Plaintiff to stop leaking to the public and Congress—which Plaintiff had not done—and asked Plaintiff, "Have I made myself perfectly clear?"

60.     On or about March 18, 2020, MARSH issued a memorandum to all NCA NAD Cemetery Directors titled, "NAD Guidance for New National Cemeteries and Expansion Projects,"

which contains provisions specific only to Plaintiff's circumstances at WNYNC, such as: "No town hall/public meetings will be held or press releases without the appropriate approval and communications with NAD and Cemetery Operations."

### G.   MARSH AND REEVES THEN FAILED TO ACCOMMODATE METCALFE'S DISABILITY—PUTTING METCALFE'S LIFE AT RISK

61.   In March 2020, New York State had the highest COVID-19 infection rates in the United States, with State officials reporting that 83,712 residents testing positive, 12,226 were hospitalized, and 1,941 had died of the virus in that month alone.

62.   On March 18, 2020, VA, directed employees to use maximum telework, to the fullest extent possible, in light of the COVID-19 pandemic.

63.   On or about March 20, 2020, VA then issued COVID-19 management guidance directing supervisors to evaluate the use of telework on a case-by-case basis, particularly for high-risk populations and to pay special attention to any employees with serious chronic medical conditions.

64.   On or about March 26, 2020, VA issued COVID-19 management guidance indicating that only NCA employees, "essential to ensuring continued burial operations" are to be excluded from VA's aforementioned maximum telework posture.

65.   Prior to the onset of the COVID-19 pandemic, VA had decided that on April 1, 2020, Plaintiff would be relocated and reassigned from his position as Director of Indiantown Gap National Cemetery—where burial operations were underway—to his current position as Director of WNYNC—where burial operations were not underway and could not start before December 18, 2020.

66.   Thus, according to VA's own COVID-19 protocols, effective April 1, 2020, Plaintiff would no longer be an employee "essential to ensuring continued burial operations."

67.     On or about Thursday, March 26, 2020, Plaintiff sent an email to MARSH stating, "I'm not feeling warm and fuzzy about going to hot bed of COVID-19 to sit in a construction trailer. I have a laptop and can [telework] in the interim."

68.     On or about Friday, March 27, 2020, Plaintiff disclosed to MARSH by phone that Plaintiff has a circulatory disorder called Leukopenia (Disability), and that Plaintiff's physician advised that—because of is Leukopenia diagnosis—Plaintiff should not travel and would face "certain death" if he contracted COVID-19.

69.     Plaintiff continued by asking MARSH to postpone Plaintiff's physical relocation to New York, which (as stated above) then had the highest COVID-19 infection rates in the United States, from Pennsylvania, where COVID-19 rates were comparatively low, given Plaintiff's physician's advice and prediction, and VA's new COVID-19 maximum telework posture for non-essential employees.

70.     In an act that terrified Plaintiff, MARSH responded to Plaintiff's reasonable accommodation request with an immediate denial, insisting that Plaintiff remained an "essential" employee notwithstanding the fact no burial services were taking place at WNYNC nor scheduled to take place for the foreseeable future. (Note that Congress amended the standard for determining whether a person is disabled under the Americans with Disabilities Act ("ADA"), and derivatively under the Rehabilitation Act, in the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. These amendments made clear that *circulatory disorders*—of which Leukopenia is one—meet the definition of "disability." 42 U.S.C. § 12102(2)(B).)

71.     On or about Tuesday, March 31, 2020, there were 499 active COVID-19 infections in Erie County, which is just one mile from WNYNC and where a number of persons working on the WNYNC construction project lived.

72.     On or about the morning of Tuesday, March 31, 2020, Plaintiff received an unexpected phone call from REEVES, Plaintiff's fifth-level supervisor. REEVES inquired about how Plaintiff was doing, as if he knew of Plaintiff's concerns about relocating to WNYNC.

73.     Plaintiff used the call as an opportunity to disclose to REEVES that Plaintiff has a circulatory disorder called Leukopenia (Disability), and that Plaintiff's physician advised that in light of his Leukopenia diagnosis, Plaintiff should not travel and would face "certain death" if he contracted COVID-19.

74.     Plaintiff then asked REEVES to postpone Plaintiff's physical relocation to New York, which then had the highest COVID-19 infection rates in the United States, from Pennsylvania, where COVID-19 rates were comparatively low, given Plaintiff's physician's advice and prediction, and VA's new COVID-19 maximum telework posture for non-essential employees.

75.     REEVES responded by telling Plaintiff he does not have to travel to WNYNC and that "the NCA wants all our employees to be safe, [and] not to worry, the NCA wouldn't place anyone in harm's way."

76.     REEVES' assurance that Plaintiff would not have to travel ended five straight days of terror and prayer during which Plaintiff and his spouse feared for Plaintiff's life and thought VA wanted Plaintiff dead. Unfortunately, it was but a temporary reprieve.

77.     On the afternoon of Tuesday, March 31, 2020, eager to confirm with MARSH that Plaintiff need not report to WNYNC the next day in accordance with REEVES' assurance, Plaintiff called MARSH and for a third time discussed his request for a reasonable accommodation to postpone Plaintiff's physical relocation to New York for all of the aforementioned reasons. For a third time, MARSH denied Plaintiff'S reasonable accommodation request, insisting that Plaintiff's relocation was essential.

78.   On or about Wednesday April 1, 2020, the day Plaintiff was to physically relocate to New York, MARSH addressed an email to Plaintiff asking Plaintiff if he had a note from his physician regarding the circulatory disorder, which the two had discussed three times previously which stated his physician's orders not to travel.

79.   This communication not only demonstrates that MARSH knew Plaintiff had a qualifying medical condition affording him legal protections, but that MARSH knew his orders for Plaintiff to physically relocate to New York violated the orders of Plaintiff's own medical provider.

80.   Note that in his sworn affidavit of July 23, 2021, MARSH asserts that, "I am not aware the complainant has a disability," despite Plaintiff's repeated communication of the same, and "[Plaintiff] never requested a Reasonable Accommodation." Concerning the latter, please further note that the EEOC requires that requests for Reasonable Accommodations need only be made using "plain English" and the term "Reasonable Accommodation" need not be used. All VA supervisors, including both Plaintiff and MARSH, receive annual training on protocols for providing reasonable accommodations.

81.   On or about April 1, 2020, Plaintiff responded to MARSH's aforementioned request by emailing a note from Plaintiff's medical provider that verified Plaintiff's disability and advised that Plaintiff should not be traveling to other states because of his low white blood cell count, which makes Plaintiff more susceptible to any infections.

82.   Within the email, Plaintiff again pleaded his case and included a link to a March 31, 2020 article from *The Washington Post* titled, "Buffalo braces to become a coronavirus battleground, even as Cuomo seeks statewide help for New York City." WNYNC is located about 30 minutes from Buffalo, New York.

83.     Without qualification or care, and in violation of VA's own direction, MARSH repeatedly denied Plaintiff's reasonable accommodation requests and in doing so illustrated total disregard for Plaintiff's life—actions that MARSH undertook from the comfort of his own home while enjoying the safety and security of VA's maximum telework posture.

84.     On or about April 2, 2020, MARSH sent Plaintiff a telework agreement form valid only through April 30, 2020. The form MARSH sent Plaintiff was completely filled out, other than the Plaintiff's signature line and date, including "Section VI – Disability and Medical Conditions," which indicated Plaintiff was *not* using telework for a qualified temporary disability or for medical reasons.

85.     On or about May 1, 2020, New York State announced that in the last month they saw a 598% increase in active COVID-19 infections in Erie County, the border of which is just one mile from WNYNC.

86.     On or about Friday, May 1, 2020, Plaintiff physically relocated to New York without first asking MARSH for an extension of his telework agreement because, by this time, Plaintiff feared MARSH more than his own death.

87.     On or about Monday, May 4, 2020, Plaintiff reported for his first day of work on-site at WNYNC.

88.     On or about May 10, 2020, Plaintiff began to experience symptoms of COVID-19, including chills, body aches, diarrhea, and chest tension, which progressively worsened over the next several days.

89.     On or about May 13, 2020, Plaintiff's physician directed him to go to the nearest hospital emergency room. That same day, Plaintiff was admitted to Olean General Hospital in

Olean, New York, where he was hospitalized and diagnosed with COVID-19. Plaintiff underwent 20 days of intensive treatment to save his life.

## H.    MARSH CONTINUED TO ACCUSE METCALFE OF ALLEGED LEAKS AND TAUNTS METCALFE WITH DISCRIMINATORY LANGUAGE

90.    On or about May 4, 2020, MARSH directed Plaintiff to establish regular WNYNC status update calls beginning Tuesday, May 12, 2022, and occurring every two weeks thereafter until WNYNC opened for burials. MARSH would later deny knowledge of certain matters repeatedly discussed on these bi-weekly calls.

91.    On or about June 9, 2020, VA received a letter from SCHUMER concerning WNYNC.

92.    On or about June 18, 2020, a meeting was held between REEVES, MARSH, and other Executive employees of VA, in which REEVES claimed "staff on the ground" at WNYNC were leaking information to SCHUMER, which he said demanded "staffing changes." Plaintiff and Program Manager PETER RIZZO ("RIZZO") were the only VA personnel "on the ground" at this time.

93.    On or about June 18, 2020, MICHAEL CARCANAGUE ("CARCANAGUE"), NCA NAD Supervisory Engineer, called Plaintiff to state that he suspected one of VA's employees helped SCHUMER write a June 9, 2020 letter to VA based on the nomenclature used in the letter.

94.    On or about Friday, June 19, 2020, MARSH issued plaintiff a "verbal counseling" and interrogated Plaintiff by phone about the details of the June 9, 2020, letter VA received from SCHUMER, implying that Plaintiff had provided information to SCHUMER or SCHUMER's staff, which Plaintiff had not done.

95.     MARSH also questioned Plaintiff about media inquiries received regarding WNYNC, implying that Plaintiff had spoken to reporters, which Plaintiff had not done. Plaintiff vigorously denied the accusations before MARSH ended the conversation.

96.     On or about Monday, June 22, 2020, MARSH issued Plaintiff an "Is considered Fully Successful or better" mid-year progress review rating for FY 2020, the highest such rating available according to VA's employee performance rating scale for mid-year progress reviews.

97.     But during a call, MARSH *again* interrogated Plaintiff about the June 9, 2020, SCHUMER letter and alleged media leaks, wanting to know who could be responsible. Plaintiff *again* vigorously denied involvement.

98.     On or about June 22, 2020, RIZZO was removed from the WNYNC project and replaced that same day by two other VA employees.

99.     On or about Tuesday, June 23, 2020, MARSH *for a third time* interrogated Plaintiff about the June 9, 2020, SCHUMER letter and alleged media leaks. Plaintiff *again* vigorously denied involvement.

100.    On or about July 20, 2020, at 4:16 PM, MARSH called his closest executive staff—MARIA GARZA ("GARZA"), NCA NAD Operations Chief, and LAURA KUSEN ("KUSEN"), Assistant to the NCA NAD Executive Director—into a meeting on short notice via an email in which MARSH wrote: "Lets **circle the wagons** at 4:30 PM today on the bridge line" (emphasis added).

101.    Only 48 minutes later, at 5:04 PM, MARSH issued Plaintiff an adverse personnel action memorandum (formal, written Counseling), which falsely accused Plaintiff of wrongdoing, dramatically altered Plaintiff's assigned duties, and instituted an unlawful gag order that prohibited Plaintiff from speaking to Members of Congress.

102.    The term "**circle the wagons**" is a culturally offensive phrase that evokes racist images of Native Americans and was coined by non-Hispanic white settlers in the 1800s in reference to the forming a circle with horse-drawn Conestoga wagons to protect against attacks from Indigenous tribes whose land the settlers had invaded.

103.    To Native Americans today, the phrase "**circle the wagons**" translates to, **the savages are coming and we are about to be attacked**, as it calls to mind images of marauding Indigenous Peoples attacking non-Hispanic White settlers as John Wayne rides in with his cavalry in tow, killing the Native peoples.

104.    Use of the phrase, "**circle the wagons**," is a sign of implicit bias against Native Americans, whether intentional or not. However, MARSH's use of the phrase to summon his closest advisors just 48 minutes before taking an adverse employment action against Plaintiff demonstrates calculated discrimination for which Plaintiff is entitled relief under Title VII.

105.    On or about July 21, 2020, in response to the aforementioned adverse employment action, Plaintiff emailed MARSH, stating that he was under the impression that the result of MARSH and Plaintiff's June 19, 2020, phone call cleared Plaintiff of any wrongdoing, and that he was surprised by the July 20, 2020, adverse employment action and feels targeted. In the same missive, Plaintiff further asked MARSH to produce and share with him all evidence MARSH possessed to justify the adverse employment action.

106.    MARSH never provided to Plaintiff the requested evidence to support MARSH's July 20, 2020, adverse employment action.

## I.    MARSH ORDERS METCALFE TO STOP TRAFFIC SAFETY ADVOCACY TO SAVE FUNDS AND EXPEDITE CONSTRUCTION; VETERANS DIE

107.    On or about March 2, 2020, Plaintiff traveled to and visited the WNYNC construction site, where he observed traffic on State Rt. 77 and Indian Falls Road—two two-lane

roadways that bound the west and north sides of WNYNC, respectively. On State Rt. 77, Plaintiff observed numerous vehicles exceeding the posted 55 mile-per-hour speed limit and saw faster vehicles passing slower vehicles along a stretch of road immediately adjacent to the cemetery site.

108.    Plaintiff became concerned that the predominantly older clientele of WNYNC, who will be unfamiliar with local road conditions, will be at risk traveling to and from WNYNC on State Rt. 77 and Indian Falls Road.

109.    Plaintiff shared his observations with RIZZO, and the two then reviewed construction drawings for a northbound turn lane on State Rt. 77 that VA planned to build as part of its WNYNC construction project, which they concluded will obscure the view of State Rt. 77 through-traffic for westbound Indian Falls Road drivers attempting to enter the State Rt. 77 intersection.

110.    On or about March 4, 2020, Plaintiff sent a letter to the New York State Department of Transportation ("NYSDOT") Commissioner and Genesee County, New York, Highway Superintendent.

111.    On or about the morning of March 5, 2020, Plaintiff separately emailed Pembroke, New York, Town Supervisor THOMAS SCHNEIDER JR., Genesee County, New York, Sheriff WILLIAM SHARON, New York State Division of Veterans' Services Director JAMES MCDONOUGH, and Genesee County, New York, Highway Superintendent TIMOTHY HENS expressing the concerns over traffic safety and over VA's planned turn lane.

112.    Later that day, Plaintiff received a response from Genesee County, New York, Sheriff SHARON stating: "I concur with your concerns and plan on presenting them at the next Traffic Safety Board meeting later this month." Subsequently, New York State Division of Veterans' Services Director JAMES MCDONOUGH forwards Plaintiff's email to NYSDOT Commissioner MARIE THERESE DOMINGUEZ asking for her attention to the safety matter.

113.    On or about March 10, 2020, at 10:00 AM, Plaintiff announced at the weekly WNYNC project team meeting, attended by MARSH and 20 others, that he identified traffic safety concerns on State Rt. 77 and Indian Falls Road while on a recent site visit and that he is concerned that unfamiliar and elderly drivers will be at increased risk of crash once the cemetery opens for business. He also advised that he sent communications to several municipal, county, and state government leaders seeking support for traffic safety improvements.

114.    On or about March 10, 2020, at 3:17 PM, Plaintiff sent an email to MARSH documenting all the support he has received from municipal, county, and state government leaders for making traffic safety improvements to State Rt. 77 and Indian Falls Road. The email included Plaintiff's letter to the NYSDOT Commissioner and Genesee County, New York, Highway Superintendent as an attachment.

115.    In the weeks and months that followed, Plaintiff continued to meet and work with VA staff and officials from NYSDOT to prepare appropriate safety improvements to State Rt. 77 and Indian Falls Road.

116.    On or about July 20, 2020, MARSH issued Plaintiff a formal memorandum of counseling, which reads in part: "You are directed to not engage with County Officials or DOT about changing traffic patterns or stops signs or speed limits." This direction abruptly prevented Plaintiff from all further work representing VA on the traffic safety issued Plaintiff had identified. This order from MARSH ended the pursuit of traffic safety improvements on VA's behalf. No other party took over Plaintiff's role in organizing meetings and leading efforts to improve traffic safety.

117.    On or about August 13, 2020, MARSH issued a new formal memorandum of counseling to Plaintiff to replace the July 20, 2020, version. This document directed Plaintiff to obtain NCA and NAD leadership approval prior to continuing any work on the traffic safety matter.

However, by this time, VA had already decided internally that it would not pursue any traffic safety improvements other than an ill-advised right turn lane, which VA had already planned to construct.

118.    On or about July 14, 2021, VA began construction of its northbound turn lane on State Rt. 77 at Indian Falls Road.

119.    On or about September 15, 2021, VA completed construction of its northbound turn lane on State Rt. 77 at Indian Falls Road and opened the lane to traffic.

120.    On or about September 22, 2021—one week after the right turn lane opened to traffic—two U.S. Army veterans were killed in a crash at the intersection of State Rt. 77 and Indian Falls Road. The two men had just left WNYNC following the burial service of a friend and fellow veteran.

121.    Plaintiff heard the crash and rushed to the site, where he began picking up the severed body parts of the two deceased and decapitated veterans, which were dispersed across the intersection—a horrifying scene that Plaintiff had worked so hard to prevent, but which DefendantS caused to occur through its actions.

## J.    MARSH ATTEMPTS UNFAIRLY PUNISH METCALFE THROUGH REASSIGN-MENT AND RELOCATION

122.    On or about the morning of October 2, 2020, MARSH spoke with SONYA ROBERTSON ("ROBERTSON"), VA Employee/Labor Relations Specialist for NCA, to pursue a Management-Directed Reassignment of Plaintiff from WNYNC to another VA facility elsewhere in the country, which would have uprooted Plaintiff and his spouse who had already purchased a property in Western New York.

123.    MARSH's justification for the Management-Directed Reassignment consisted of two categorically false allegations that (1) Plaintiff did not keep MARSH informed of WNYNC

Consecration Ceremony event particulars; and (2) Plaintiff compromised the safety of others by violating NCA COVID-19 guidance during the WNYNC Consecration Ceremony.

124.     Plaintiff did, however, keep MARSH abreast of all matters related to the WNYNC Consecration Ceremony through MARSH's participation in regular weekly and bi-weekly briefings, and emails from Plaintiff to MARSH, in addition to MARSH's own documented accounts of the same.

125.     For example, on August 6, 2020—after a regularly scheduled bi-weekly WNYNC briefing with MARSH—MARSH emailed POZZEBON with an update on WNYNC Consecration Ceremony, including that Plaintiff "has been working closely with the local VA chaplain to identify religious denominations and representatives to participate in the consecration ceremony slotted for September 2020."

126.     On August 18, 2020, Plaintiff emailed MARSH an update on the September 24, 2020, WNYNC Consecration Ceremony planning process. On September 15, 2020, MARSH participated in the weekly WNYNC construction project meeting, during which Plaintiff discussed the latest preparations of the September 24, 2020, WNYNC Consecration Ceremony.

127.     On September 22, 2020, MARSH participated in the weekly WNYNC construction project meeting, during which Plaintiff discussed the latest preparations of the September 24, 2020 WNYNC Consecration Ceremony.

128.     Further, MARSH was the most senior VA executive to attend the WNYNC Consecration Ceremony; not once before or during the event did he identify to Plaintiff or otherwise any concern about public safety, and in MARSH's own account of the event, from September 27, 2020, MARSH cited no safety violations and instead proclaimed that the Ceremony was executed "without incident."

129.    On or about October 2, 2020, ROBERTSON—yet unaware that MARSH's allegations against Plaintiff were false—sent MARSH an email subsequent to their conversation earlier that day. The email stated that MARSH's request for a Management-Directed Reassignment of Plaintiff "poses substantial risks to the agency since the employee was recently placed in the position as part of an agreement," meaning Plaintiff's 2014 EEO settlement agreement, which caused his reassignment and relocation to WNYNC.

## K.    MARSH RETALIATES AGAINST METCALFE FOR ALLEGEDLY WRONGFUL PUBLIC OUTREACH

130.    On or about November 19, 2020, MARSH issues Plaintiff another adverse personnel action, this time in the form of an Admonishment, which alleged that: (1) Plaintiff gave EVANGELINE CONLEY ("CONLEY"), former VA Western New York Health Care System Public Affairs Officer, permission to post photos of the WNYNC Consecration Ceremony on social media (Facebook) without MARSH's approval; and (2) Plaintiff responded to an email inquiry from reporter from the *Batavia Daily News* without first obtaining MARSH's approval. The Admonishment specifies that both allegations violated a March 18, 2020 memorandum issued by MARSH.

131.    However, neither the March 18, 2020, memorandum nor any other verbal or written direction from MARSH to Plaintiff contained instruction on social media postings or media correspondence which would have superseded VA's standard policies and procedures in place at the time.

132.    Further, on or about September 24, 2020, immediately after the WNYNC Consecration Ceremony, MARSH; Plaintiff; BROOK TINAGLIA ("TINAGLIA"), WNYNC Management Analyst; LISA HASTEE ("HASTEE"), WNYNC Cemetery Operations Foreman;

and CONLEY were collectively discussing the success of the Ceremony when CONLEY asked Plaintiff if she could post photos of the event on VA's Facebook page.

133.    As Plaintiff responded favorably to CONLEY's question, Plaintiff and CONLEY turned to MARSH for concurrence as the most senior VA executive present, who was seen nodding his head in agreement according to CONLEY's sworn witness statement.

134.    CONLEY subsequently posted photos from the event to Facebook. Thus, MARSH did in fact approve the posting of WNYNC Consecration Ceremony photos to Facebook, despite the allegation otherwise stated in MARSH's November 19, 2020, Admonishment.

135.    Further, immediately following the WNYNC Consecration Ceremony on or about September 24, 2020, in front of multiple witnesses, MARSH directly authorized CONLEY to post photos of the event to Facebook by nodding his head in agreement in response to CONLEY asking Plaintiff and MARSH for permission to do the same.

136.    Additionally, on or about September 25, 2020, at 3:17 PM, Plaintiff and LES MELNYK ("MELNYK"), NCA Public Affairs Chief, received an email from *Batavia Daily News* reporter BRIAN QUINN ("QUINN") asking seven questions.

137.    Although Plaintiff could have directly responded to QUINN's email pursuant to the June 28, 2010, version of NCA Handbook 8500, Section 3(e)(5), which was in effect at the time and requires Cemetery Directors to "[return] news media calls promptly," Plaintiff did not communicate with QUINN by email, phone, or otherwise in response to QUINN's seven questions. Instead, Plaintiff left this to MELNYK.

138.    On or about September 25, 2020, at 3:33 PM, Plaintiff sent an email to MELNYK with information intended to help MELNYK prepare answers to three of QUINN's seven questions.

139.     On September 25, 2020, at 4:04 PM, MELNYK forwarded draft responses to all of QUINN's seven questions via email to MARSH; POZZEBON; TOM HOWARD ("HOWARD"), NCA Chief of Staff; and six other leaders employed by VA.

140.     In the email, MELNYK states: "I need leadership concurrence on these draft responses before I can go to [the VA Office of Public and Intergovernmental Affairs]."

141.     On or about September 25, 2020, at 6:37 PM, HOWARD directed that no NCA employee respond to QUINN.

142.     On or about September 27, 2020, the *Batavia Daily New* published an article by QUINN detailing the WNYNC Consecration Ceremony. The article heavily quoted WILLIAM JOYCE ("JOYCE"), Director of the Genesee County Veterans Service Agency, who attended the event.

143.     Suspicion swirled that somehow Plaintiff had fed information to QUINN. In an email on or about September 28, 2020, however, MELNYK confirmed to HOWARD and POZZEBON that the source of the story was JOYCE.

144.     Concerning QUINN's inquiry, MELNYK stated in a sworn affidavit on or about August 24, 2021 that, "Plaintiff did not correspond directly with Mr. Quinn on Sept. 25, [2020], but instead forwarded his draft responses to me for clearance with NCA and VA leadership, which was the appropriate procedure for a response to a media query." Thus, Plaintiff did no wrong in handling the media inquiry in question.

## L.     MARSH ATTENDED CONSECRATION CEREMONY TO SPY ON METCALFE AND THEN MARSH LIED ABOUT HIS PARTICIPATION IN THE CEREMONY

145.     MARSH sought opportunities to spy on Plaintiff, including using his attendance of the WNYNYC consecration ceremony.

146.    To avoid responsibility for the ceremony, however, MARSH lied and altered federal government documents to mask his intent.

147.    MARSH demonstrated through a consistent and intentional pattern of actions before and after the WNYNC Consecration Ceremony his intent to minimize and understate his knowledge of and participation in the Ceremony—a strategy flawed only by the abundance of contradictory documentary, testimonial, and photographic evidence.

148.    As previously stated, Plaintiff kept MARSH abreast of all matters related to the WNYNC Consecration Ceremony through MARSH's participation in regular weekly and bi-weekly briefings, and emails from Plaintiff to MARSH. MARSH even produced his own documented accounts of the same.

149.    Despite this, beginning days before the WNYNC Consecration Ceremony and continuing thereafter, MARSH produced a series of evidentiary documents in which he repeatedly and falsely understates his knowledge of involvement in the WNYNC Consecration Ceremony.

150.    On or about September 22, 2020, MARSH told Plaintiff by email that he will be visiting WNYNC on September 24, 2020, which happens to be the very same day as the WNYNC Consecration Ceremony and represents MARSH's first visit to WNYNC since December 4, 2019.

151.    In the email, MARSH states: "It will be the typical construction site visit to tour site to observe progress, meet new cemetery employees as well as talk with project site manager."

152.    The body of MARSH's email, however, says nothing about the WNYNC Consecration Ceremony, but MARSH's separate travel itinerary very clearly lists the 1:00 PM Consecration Ceremony.

153.    On or about September 24, 2020, MARSH attended the WNYNC Consecration Ceremony and even delivered an impromptu speech to members of the Honor Guard present, per photographic evidence and witness statements.

154.    On or about September 25, 2020, at 7:02 PM, MARSH sent an email to Plaintiff, GARZA, and KUSEN containing a list of WNYNC Consecration Ceremony attendees, in which MARSH stated: "I was not invited and did not participate in consecration event; however, I chose to conduct a site progress visit on this day."

155.    On or about Sunday, September 27, 2020, MARSH issued a "timeline" of events associated with the WNYNC Consecration Ceremony, which MARSH and others prepared without any assistance from Plaintiff or other WNYNC personnel.

156.    Evidence shows that the document originally stated MARSH had "attended" the ceremony, but on an unknown date on or before September 27, 2020, MARSH replaced the word "attended" with "observed."

157.    On an unknown date on or before September 27, 2020, evidence shows that KUSEN deleted a line in the aforementioned timeline that referenced when Plaintiff notified NAD of the WNYNC Consecration Ceremony, reinforcing MARSH's falsely alleged ignorance of the event.

158.    MARSH, so emboldened by his plan, was undeterred when ROBERTSON advised Plaintiff could not be punished with a Management-Directed Reassignment, and instead pursued an alternative adverse personnel action—an Admonishment—which he issued to Plaintiff on or about November 19, 2020.

**M.      MARSH TREATED METCALFE WORSE THAN HIS PEERS TO UNDERMINE, EMBARRASS, AND RETALIATE AGAINST METCALFE**

159.    On November 19, 2020, MARSH met with Plaintiff to go over Plaintiff's FY 2020 performance appraisal. MARSH issued Plaintiff a "Fully Successful" end-of-year rating and told Plaintiff that he did not receive a higher score because he had invited too many people to the WNYNC Consecration Ceremony.

160.    But MARSH's own September 27, 2020 WNYNC Consecration Ceremony timeline states, "[t]he specific guidance given to the Cemetery Director was […] 50 [people] or less," and only 33 people attended the event.

161.    Subsequent to Plaintiff filing his formal EEO complaint against VA, MARSH, on or about July 23, 2021, signed a sworn affidavit, in which MARSH states that Plaintiff could not have earned a higher FY 2020 performance rating because "[t]he non-operational status of [WNYNC] prevent a different rating." Note the pretextual shift in MARSH's justification for Plaintiff's assigned rating level.

162.    MARSH is basing that determination on Plaintiff's performance against the "performance plan" MARSH had assigned to Plaintiff. But MARSH's new justification for assigning Plaintiff a lower-than-deserved performance rating is just as flawed as his initial explanation.

163.    Pursuant to Parts I(i) and I(m) of VA Handbook 5013, it is MARSH's duty to "ensure each employee receives a performance plan […] no later than 60 days from […] appointment to a new position," and "Performance standards must be understandable, challenging, realistic, and attainable."

164.    MARSH, however, never issued Plaintiff a revised performance plan after Plaintiff's reassignment to WNYNC, and—as MARSH himself conveniently acknowledges—

Plaintiff's performance plan did not match his duties at WNYNC, meaning that MARSH had assigned Plaintiff a performance plan that was neither "realistic" nor "attainable."

165.    Besides the pretextual nature of MARSH's changing explanation for why he assigned Plaintiff a performance rating two levels below the rating MARSH issued Plaintiff one year earlier, MARSH's written assessment of Plaintiff's FY 2020 performance indicates a far superior performance by Plaintiff compared to MARSH's written assessment of SUE JEHLEN ("JEHLEN"), a GS-14 Cemetery Director, for the same rating period.

166.    Plaintiff's FY 2020 performance appraisal included the following written comments from MARSH (emphasis added):

> "Plaintiff **successfully** oversaw burial and cemetery operations, maintaining a **100% burial accuracy rate** at [Indiantown Gap National Cemetery]. He **ensured** grounds are maintained in a manner **befitting National Shrine status**. […] Under his leadership, [Indiantown Gap National Cemetery] met NCA standards for inscribing headstones with **99.9[%] accuracy**."

> "Plaintiff demonstrated **great customer service and public relations** during the rating period. **He maintained positive relationships with external parties**, to include VSO, Community Veterans Engagement Boards and local interested parties. He **resolves customer inquiries and complaints in a timely manner** and within NCA standard. **He utilized the cemetery social media page to keep the public informed on updates and information sharing for the cemetery**…."

> "Plaintiff **effectively managed cemetery resources**, making steady progress toward achieving the allotted 30 FTEE. All contracts were awarded and managed in a **professional and efficient manner**."

> "Plaintiff **ensured** cemetery employees completed all mandatory training, **exceeding NCA requirements**. He was **proactive** with initiating vacancy requirements with HR, utilizing the direct hire capability during the COVID-19 pandemic."

> "Plaintiff is a passionate leader who provides keen oversight of all cemetery operations."

167.    The only negative comment MARSH entered into Plaintiff's FY 2020 performance appraisal is: "[Indiantown Gap National Cemetery] did not meet NCA standard for gravesites marked within 60 days, with 72% with 60 days for FY20." However, later in the same appraisal record, MARSH clarifies that the above-stated deficiency was **beyond Plaintiff's control** and "due to national contractor delays for upright headstones."

168.    MARSH's comments regarding Plaintiff's FY 2020 performance are plainly **better and stronger** than those MARSH included in the FY 2020 performance appraisal of JEHLEN, and yet MARSH awarded JEHLEN with an "Outstanding" (5/5), while assigning Plaintiff a "Fully Successful" (3/5) rating. This disparity could not be any clearer.

## N.    MARSH CONTINUED TO UNREASONABLY AND OBSESSIVELY (BORDERING ON PARANOIA) BLAME METCALFE FOR "LEAKS"

169.    On or about November 23, 2020, at 11:05 AM, MARSH called Plaintiff and accused Plaintiff of leaking information about the WNYNC Dedication Ceremony planned for November 30, 2020, because of a recent article by JERRY ZREMSKI ("ZREMSKI") of *The Buffalo News*

170.    During the call, Plaintiff flatly and truthfully denied furnishing information to any reporter and stated that he is concerned about MARSH's repeated false accusations of wrongdoing by Plaintiff.

171.    Plaintiff then offered to file a complaint with the VA Office of Inspector General ("OIG") to investigate and clear Plaintiff's name—an offer MARSH immediately declined, and which prompted the end of MARSH's interrogation.

172.    Five hours after this call, Plaintiff memorialized the details of this conversation in an email to MARSH, which went uncontested by MARSH. Plaintiff again made clear to MARSH that Plaintiff perceived MARSH's actions to represent harassment and discrimination.

173.    On or about November 23, 2020, at 4:08 PM, Plaintiff initiated an administrative grievance over the November 19, 2020, Admonishment he received from MARSH via a letter signed by Plaintiff and emailed to MARSH.

174.    The letter expressly states that Plaintiff believes MARSH has "**singled me out among all other National Cemetery directors you supervise and have treated me differently because I am Native American, in direct violation of Title VII of the Civil Rights Act of 1964**" (emphasis added). (Note that in his sworn affidavit of July 23, 2021, MARSH asserts that, "Plaintiff has never discussed or implied that he felt he was being discriminated, harassed, or reprised against due his protected basis.")

175.    On or about November 24, 2020, MARSH issued a memorandum to his friend and peer, STEPHAN FRANK ("FRANK"), assigning FRANK to serve as the examiner for Plaintiff's grievance, despite the fact that FRANK fails to represent in appearance or fact an independent party based on his relationship with MARSH.

176.    On or about November 24, 2020, MARSH issued a memorandum to Plaintiff advising that his grievance had been accepted, but that "[a]llegations of discrimination on the basis of race, color, religion, sex, national origin, age over 40 and/or disabling condition" had been expressly excluded from the grievance and that Plaintiff should instead file an EEO complaint.

177.    On or about November 24, 2020, DECKER told Plaintiff he is no longer allowed to attend the WNYNC Dedication Ceremony due to New York State COVID-19 restrictions on attendance numbers. Note that in or about March 2020, DECKER successfully lobbied to exempt WNYNC from New York State's COVID-19 restrictions to enable construction work to continue despite known human health risks, but made no effort to seek an exemption to allow Plaintiff to attend the dedication of the National Cemetery to which he is assigned and helped establish.

178.    On or about November 27, 2020, GARZA called EDWARD HAJDUK ("HAJDUK"), Director of National Cemetery for the Alleghenies, to ask if he could attend the WNYNC Dedication Ceremony and told HAJDUK that Plaintiff would not be attending the ceremony.

179.    On or about July 27, 2021, DECKER signed a sworn affidavit which states, the "Cemetery director was always on the invitation list" for the WNYNC Dedication Ceremony, despite the fact that GARZA told HAJDUK on or about November 27, 2020, that Plaintiff was not going to be in attendance at the Ceremony.

180.    DECKER's affidavit also states that on the day she rescinded Plaintiff's invitation, she "was frustrated about the leak to the media because [she] was yelled at by [her] leadership." Note also that DECKER's sworn affidavit states that she was not aware that Plaintiff has a disability, despite the existence of a detailed text message exchange between DECKER and RIZZO on May 12, 2020, in which RIZZO told DECKER that Plaintiff has a circulatory disorder that resulted in his hospitalization.

181.    On or about November 29, 2020, Plaintiff was present at WNYNC for the WNYNC Dedication Ceremony rehearsal.

182.    On or about November 29, 2020, REEVES approached Plaintiff in front of Plaintiff's subordinate (TINAGLIA), supervisor (MARSH), and contractor (URBAN), and loudly and sternly said to Plaintiff: "Jim, **are you staying out of trouble?!**," only to then completely ignore Plaintiff and devote gratuitously positive attention to TINAGLIA.

## O.    MARSH ATTEMPTED TO CREATE CIRCUMSTANCES UNDER WHICH METCALFE WOULD FAIL

183.    On or about August 31, 2020, MARSH emailed the Director of the new Acadia National Cemetery, stating (emphasis added): "[REEVES] and I fully understand the level of effort

and oversight required that accompanies new cemetery construction as well as **the planning and execution required of burial start up** and cemetery dedication."

184.     On or about September 28, 2020, MARSH uncharacteristically directed Plaintiff to call in for an executive-level WNYNC project briefing "for [Plaintiff's] listening awareness only." Plaintiff had never before been invited to participate in any such meeting, and was never again invited. During this meeting, which lasted only about seven minutes, REEVES announced, "We probably won't [start burials at WNYNC until] sometime next spring," meaning the spring of 2021.

185.     On November 30, 2020, REEVES met with MARSH and URBAN, owner of the construction company building WNYNC, to discuss when burials could begin at WNYNC. Plaintiff was not a party to this discussion.

186.     On or about November 30, 2020, immediately before the WNYNC Dedication Ceremony, REEVES approached Plaintiff in the event tent and said in a condescending and derogatory tone: "I have a date in my head when you're gonna start interments [(a.k.a., burials)]. I'm gonna make the announcement at this dedication—everybody will know today, so you better be ready."

187.     On or about November 30, 2020, during the WNYNC Dedication Ceremony, REEVES ordered and directed that interments commence no later than December 18, 2020—**a mere 14 business days later**.

188.     Based on the timelines in the VA National Cemetery Administration Cemetery Opening Plan handbook, first burials occur ***four to 12 months*** after the dedication ceremony.

189.     Cemetery Directors are exclusively responsible for deciding when burials begin, as they hold ultimate responsibility and accountability over all operations at their facility.

190.    At no other National Cemetery dedication ceremony did REEVES ever make a surprise announcement of the burial start date as he did at the WNYNC Dedication Ceremony.

191.    Until November 30, 2020, Plaintiff and his staff had been under the false impression that burials at WNYNC would not begin until the spring of 2021, based on what REEVES had announced during the September 28, 2020 meeting, which MARSH directed Plaintiff to attend. No one had informed Plaintiff otherwise.

192.    On or about August 4, 2021, POZZEBON signed a sworn affidavit affirming that NCA executive leaders "were expecting a flood of people to schedule right away" after REEVES' November 30, 2020, announcement that WNYNC would begin accepting burials on December 18, 2020.

193.    Consider that MARSH and REEVES clearly understand the complexities of preparing a new National Cemetery for first burials per MARSH's August 31, 2020 email to the Director of Acadia National Cemetery; the unusual steps MARSH took to invite Plaintiff to the September 28, 2020 executive-level meeting during which REEVES announced that burials at WNYNC would likely not begin until the spring of 2021; the threatening manner in which REEVES told Plaintiff that he "better be ready" to start burials; and the fact that REEVES publicly gave Plaintiff and Plaintiff's staff only 14 business days to prepare for burials to begin.

194.    These facts represent a pattern of events that on the whole indicate REEVES knew the negative consequences of directing Plaintiff to begin burials with just 14 business days of advanced notice, and very likely knew on September 28, 2020 that he would direct Plaintiff during the WNYNC Dedication Ceremony to begin burials by an impossibly short deadline despite implying otherwise during the meeting that Plaintiff was invited to attend.

195.    On August 14, 2021, REEVES signed a sworn affidavit, in which he states, "I'm not sure if the complainant has a disability under ADA, etc." even though Plaintiff had explained the same to REEVES during a March 31, 2020, phone call. REEVES' affidavit further states that "Senior Executives had no prior knowledge that [the October 9, 2019] town hall was taking place," even though MARSH (himself a "Senior Executive") was completely aware of all details related to this event, and even approved the press release on October 2, 2019, just days before he denied all knowledge of the event.

**P.    MARSH    RETALIATED    AGAINST    METCALFE    FOR    DISCLOSING DISCRIMINATION; CONTINUES OBSESSION WITH ALLEGED "LEAKS"**

196.    Following MARSH's receipt of Plaintiff's administrative grievance letter on November 23, 2020, Plaintiff was subjected to retaliatory treatment by VA.

197.    At no time in November 2020, did MARSH acknowledge National Native American Heritage Month, but three months later—in February 2021—he and his staff sent out an urgent directive to identify every Buffalo Soldier buried in the North Atlantic District and then on February 25, 2021 sent out an email discussing the "significant contributions of African Americans throughout our nation's history."

198.    On or about November 30, 2020, REEVES did not mention Plaintiff's name in his speech, even though REEVES consistently mentions Cemetery Directors by name in the speeches he delivers at National Cemetery dedication ceremonies.

199.    For example, on or about December 12, 2020, REEVES delivered a speech during the Dedication Ceremony for Morovis National Cemetery and acknowledged Cemetery Director JUAN NIEVES ("NIEVES"), and thanked him profusely just one minute and 41 seconds into his speech.

200.    On or about December 3, 2020, POZZEBON directed AMEROPHAN CALLAHAN ("CALLAHAN"), NCA Field Programs Executive Director, to send her the latest burial schedule for WNYNC every weekday because NCA headquarters executives "were expecting a flood of people to schedule right away." This act of increased scrutiny is not generally applied to new National Cemeteries.

201.    On December 29, 2020, FRANK issued a grievance report to POZZEBON concerning Plaintiff's grievance of the November 19, 2020, Admonishment. FRANK never contacted Plaintiff during the examination process and relied on the July 20, 2020, adverse personnel action counseling memorandum—which was officially rescinded on August 13, 2020—to justify sustaining MARSH's Admonishment, per his December 29, 2020 report to POZZEBON.

202.    On or about January 12, 2021, POZZEBON directed MARSH to reduce the Admonishment to a Counseling.

203.    On or about January 19, 2021, MARSH issued Plaintiff a "Letter of Counseling," which states in part: "On or about September 25, 2020, you failed to get approval from North Atlantic District leadership before responding to an email inquiry from Brian Quinn, Staff Writer, *The Daily News* (sic), regarding information pertaining to the [WNYNC] Consecration Ceremony, as I instructed you in a memorandum dated March 18, 2020." As previously established, this allegation is false.

204.    The Letter of Counseling further states: "From now on, you are required to coordinate all media responses with the North Atlantic District Office. **Failure to do so may result in disciplinary action up to and including the removal from federal service**" (emphasis added). Other than Plaintiff, no Cemetery Director under MARSH's leadership has ever faced the threat

of termination over communications with the media. Similarly, Plaintiff is the only Native American Cemetery Director under MARSH's leadership.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: RACE-BASED DISCRIMINATION
### Violation of Title VII of the Civil Rights Act of 1964

205.    Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

206.    Plaintiff's race is Native American.

207.    VA has been on notice of Plaintiff's race since September 24, 2019.

208.    VA issued Plaintiff verbal counseling on June 19, 2020, based entirely on false allegations of wrongdoing and which expressly violated Plaintiff's rights.

209.    VA issued Plaintiff a written counseling on July 20, 2020, based entirely on false allegations of wrongdoing and which expressly violated Plaintiff's rights.

210.    VA issued Plaintiff a written counseling on August 13, 2020, which dramatically altered Plaintiff's duties and set Plaintiff up for failure.

211.    VA lied to VA's own human resource staff in a failed attempt to forcibly reassign Plaintiff to another duty station.

212.    VA lied to VA's own human resource staff to justify an alternate disciplinary action—in the form of an admonishment—which was issued to Plaintiff on November 19, 2020 and contained two charges of wrongdoing, both of which were entirely false.

213.    In response to an administrative grievance filed by Plaintiff for the falsified admonishment, VA assigned VA's friend to serve as the grievance examiner.

214.    VA issued Plaintiff an FY 2020 end-of-year performance rating that was 40% lower than Plaintiff's Non-Hispanic White colleague of the same pay grade, position, and supervisory

chain, despite the fact that VA's written justification for Plaintiff's lower performance rating indicated a far superior performance than VA's written justification for the Non-Hispanic White colleague who VA awarded the highest performance rating possible.

215.   VA uninvited Plaintiff to the dedication ceremony for the facility Plaintiff oversees, forced Plaintiff to sit in the back of the dedication ceremony tent, and failed to acknowledge Plaintiff during the dedication ceremony, despite VA exhaustively acknowledging and celebrating Plaintiff's Hispanic colleague of the same position at a dedication ceremony fewer than two weeks later.

216.   VA summoned two of Plaintiff's Non-Hispanic White colleagues of the same position to travel from their facilities to Plaintiff's facility on the dedication ceremony date to assist with the event and directed them not to inform Plaintiff they were coming and told them that Plaintiff would not be there for the dedication ceremony.

217.   VA directed Plaintiff to begin burials at Plaintiff's facility with just 14 business days' notice, despite VA knowing this to be an impossible task, and with VA believing that Plaintiff would be flooded with burial requests.

218.   VA allowed Plaintiff's Hispanic colleague of the same position at a different facility to decide for himself when burials could begin at his facility.

219.   VA's actions interrupted Plaintiff's work, subverted Plaintiff's leadership; turned colleagues against Plaintiff; left Plaintiff unable to concentrate or sleep; caused Plaintiff to experience muscular tremors, heart palpitations, intestinal discomfort, headaches, nose bleeds, and other physical illnesses; and left Plaintiff under intolerable emotional distress at work.

220.   As a result of VA's willful unlawful conduct in violation of Title VII of the Civil Rights Act of 1964, Plaintiff has suffered grievous, extensive, and continuing damages, including

but not limited to lost wages, benefits, liquidated damages, attorneys' fees, and the costs of this action.

## SECOND CLAIM FOR RELIEF: DISABILITY DISCRIMINATION
## (FAILURE TO ACCOMMODATE)
### Violation of Rehabilitation Act of 1973

221.    Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

222.    Plaintiff is qualified to perform the essential functions of the position of GS-1630 Cemetery Administrator (i.e., Cemetery Director) and for more than two decades has consistently met or exceeded VA's performance expectations (29 CFR § 1630.2(m), (o).

223.    Plaintiff is an individual with disabilities within the meaning of the Rehabilitation Act (42 U.S.C. § 12102(2)(B), 29 CFR § 1630.2(h)).

224.    Plaintiff was first diagnosed with Leukopenia—a circulatory disorder affecting Plaintiff's immune system, characterized by an abnormally low number of white blood cells in the blood circulation—in or about 1999.

225.    Plaintiff was first diagnosed with a paralyzed right foot and ankle in or about 1996.

226.    Plaintiff has a record of suffering from Leukopenia and a paralyzed right foot and ankle.

227.    VA has been on notice of Plaintiff's Leukopenia diagnosis since March 2020 (29 CFR § 1630.2(k)).

228.    VA has had a record of Plaintiff's paralyzed right foot and ankle disability since December 2000 (29 CFR § 1630.2(k)).

229.    VA, by and through certain supervisors and coworkers of Plaintiff (i.e., MARSH, REEVES, DECKER, and POZZEBON), regarded Plaintiff as an individual with the disability

impairment of Leukopenia (disability) or disabling impairments of Leukopenia and a paralyzed right foot and ankle (disabilities) (29 CFR § 1630.2(g), (j)(2)).

230.     VA failed to offer or provide Plaintiff a reasonable accommodation to telework.

231.     Plaintiff's reasonable accommodation requests were repeatedly denied by VA.

232.     Only after Plaintiff's repeated requests and VA's repeated denials did VA finally request medical documentation of Plaintiff's disability.

233.     VA subsequently allowed Plaintiff to telework for an unreasonably short 30-day period via a telework agreement document in which VA expressly stated the telework approval did **not** represent "an accommodation for a qualified temporary disability or for medical reasons."

234.     VA treated Plaintiff differently, in that other staff not assigned to active cemeteries were allowed to participate in the VA's emergency COVID-19 telework program while Plaintiff's requests to participate were repeatedly denied despite the fact that he qualified for the program and had a compelling medical need for the same.

235.     VA did not propose any alternative accommodations when Plaintiff initially requested to telework and instead denied his request without explanation.

236.     VA failed to engage in an interactive process with Plaintiff upon expiration of the unreasonably short telework period to ascertain whether it was safe for Plaintiff to travel to other states before requiring Plaintiff to do so (29 C.F.R. § 1630.2(o)(3)).

237.     VA's actions forced Plaintiff to travel in violation of Plaintiff's doctor's orders, resulting in Plaintiff contracting COVID-19, leading to Plaintiff's hospitalization and a total of 20 days of medical treatment.

238.   VA acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights when VA insisted Plaintiff was an essential employee even though Plaintiff's duties at WNYNC did not meet VA's definition of "essential."

239.   VA's actions were based on its discriminatory animus and were due to its intentional efforts to deny Plaintiff any reasonable accommodations.

240.   By the acts and practices described above, VA has violated Plaintiff's rights on the basis of his disability.

241.   VA subjected Plaintiff to unlawful harassment due to his disability in violation of the Rehabilitation Act and ADA regulations, causing Plaintiff severe anxiety and panic attacks.

242.   VA caused Plaintiff to enter an environment where he was exposed to COVID-19, contracted COVID-19, and was subsequently hospitalized and underwent 20 days of medical treatment.

243.   Providing a reasonable accommodation to Plaintiff would not have posed undue hardship on VA or its operations.

244.   VA is the recipient of federal financial assistance in that it is a federal agency.

245.   As a result of VA's willful unlawful conduct in violation of the Rehabilitation Act of 1973, Plaintiff has suffered grievous, extensive, and continuing damages, including but not limited to mental anguish, humiliation, embarrassment, reputational harm, emotional injury, lost wages, benefits, liquidated damages, attorneys' fees, and the costs of this action.

### THIRD CLAIM FOR RELIEF: RETALIATION
### Violation of the Rehabilitation Act of 1973

246.   Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

247. Plaintiff engaged in protected activity when he filed an EEO complaint and when he made numerous requests for reasonable accommodations.

248. Plaintiff experienced retaliation since he initially requested to telework in March 2020. In the wake of the initial request, VA began to micromanage Plaintiff and altered Plaintiff's duties in ways that violated Plaintiff's rights, such as his right to speak with Members of Congress.

249. In retaliation, VA marginalized Plaintiff from the rest of his colleagues and no longer selected him for special assignments.

250. As such, VA caused Plaintiff continuing emotional and physical pain and suffering, including devastating mental anguish and distress.

251. VA knew or, in the exercise of reasonable care, should have known, of the abusive and reprehensible conduct directed against Plaintiff by MARSH, REEVES, DECKER, and POZZEBON, but nevertheless did nothing, thereby acquiescing and condoning the unlawful conduct.

252. The retaliatory conduct and actions taken by VA were causally connected to Plaintiff's protected activity.

253. VA failed to effectively remedy or prevent and, indeed, exacerbated the reprisal against Plaintiff, although VA knew, or in the exercise of reasonable care, should have known, of the retaliation and its causal affect upon Plaintiff.

254. The hostile, abusive, demeaning, and humiliating work environment resulting from the retaliation to which Plaintiff was subjected unreasonably interfered with Plaintiff's work; caused Plaintiff to miss over 100 hours of work; and unlawfully altered the terms, conditions and privileges of his employment.

255.     By the acts and practices described herein, VA retaliated against Plaintiff for engaging in protected activities, in violation of the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 794; 106. Due to the willful and deliberate actions of the VA, and as a proximate cause thereof, Plaintiff has been and continues to be denied his right to equal employment opportunity.

256.     VA's actions described above directly and proximately have caused and continue to cause, Plaintiff to suffer future pecuniary losses; losses to his pension; inconvenience; emotional distress; mental anguish; loss of enjoyment of life; pain and suffering; and other non-pecuniary losses.

## FOURTH CLAIM FOR RELIEF:
## RETALIATORY HOSTILE WORK ENVIRONMENT
### Violation of the Rehabilitation Act of 1973

257.     Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

258.     VA's conduct was objectively hostile and abusive.

259.     On numerous occasions, Plaintiff requested accommodations from MARSH to no avail. And when Plaintiff was finally granted a reasonable accommodation, it was only for a 30-day period, by the end of which Plaintiff was afraid to ask VA for an extension, fearing further retaliation and hostility.

260.     VA repeatedly denied Plaintiff the ability to telework even though other employees with underlying medical conditions had the right to do so.

261.     As a result of VA's wanton, willful, and intentional behavior, Plaintiff was subjected to a life-threatening situation—having to relocate to the epicenter of the COVID-19 pandemic. Plaintiff's work environment became so toxic and hazardous to his health that he was at one point in May 2020 hospitalized for days.

262.     As a result of the VA's unlawful conduct, Plaintiff has suffered grievous, extensive, and continuing damages, including but not limited to mental anguish, humiliation, embarrassment, reputational harm, emotional injury, lost wages, benefits, liquidated damages, attorneys' fees, and the costs of this action.

## FIFTH CLAIM FOR RELIEF: RETALIATION
## Violation of Title VII of the Civil Rights Act of 1964

263.     Plaintiff formally notified VA that he was the subject of harassment and discrimination in November 2020, through which MARSH, REEVES, and POZZEBON were eventually put on notice of Plaintiff's protected status and activities.

264.     In the wake of Plaintiff giving said notice, MARSH, REEVES, and POZZEBON continued to harass and discriminate against Plaintiff on repeated occasions.

265.     As a result of VA's unlawful conduct, Plaintiff has suffered grievous, extensive, and continuing damages, including but not limited to mental anguish, humiliation, embarrassment, reputational harm, emotional injury, lost wages, benefits, liquidated damages, attorneys' fees, and the costs of this action.

## REQUEST FOR ATTORNEY AND EXPERT FEES AND COSTS

266.     If Plaintiff prevails, he is entitled to an award of attorney and expert fees and costs.

## DEMAND FOR TRIAL BY JURY

267.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court will grant his judgment containing the following relief:

a.      Impanel a jury to hear Plaintiff's claims;

b.      Costs and disbursements of this action;

c.      Declare the aforementioned actions of VA to be in violation of federal statutes and in violation of the United States Constitution;

d.      As and for Plaintiff's First Claim, grant Plaintiff an amount to be determined at trial, in no event less than $15,000,000.00;

e.      As and for Plaintiff's Second Claim, grant Plaintiff an amount to be determined at trial, in no event less than $15,000,000.00;

f.      As and for Plaintiff's Third Claim, grant Plaintiff an amount to be determined at trial, in no event less than $15,000,000.00;

g.      As and for Plaintiff's Fourth Claim, grant Plaintiff an amount to be determined at trial, in no event less than $15,000,000.00;

h.      As and for Plaintiff's Fifth Claim, grant Plaintiff an amount to be determined at trial, in no event less than $15,000,000.00;

i.      An award to Plaintiff of the costs of this action, including reasonable attorneys' fees and expert fees, to the fullest extent permitted by applicable laws and statutes;

j.      An award of pre- and post-judgment interest on all of Plaintiff's statutory claims; and

k.      Such other and further relief as this Court deems necessary and proper.


Dated: January 25, 2023
        Buffalo, New York

                                        ADVOCATES FOR JUSTICE,
                                        CHARTERED ATTORNEYS
                                        *Attorneys for Plaintiff*

                                        By: _____/s/ *Nathan D. McMurray*_____
                                                Nathan D. McMurray
                                        225 Broadway, Suite 225
                                        New York, New York 10007
                                        (212) 285-1400 / (917) 923-8136
                                        nmcmurray@advocatesny.com